## TRACY *v.* LESLIE.

INTERFERENCES; REDUCTION TO PRACTICE; SCOPE OF ISSUE; CONSTRUCTION OF ISSUE BY ACTION OF EXAMINER.

1. A fodder-shredder in which a cutter-bar was taken out of an old machine, leaving an inch of open space between the edges of the cutter-teeth and the periphery of the lower feed-roll at the point of nearest approach, is not a reduction to practice of an issue which calls for cutters arranged in immediate relation to the lower feed-roll, whereby the points of the teeth of the cutter are brought close to the said feed-roll.

2. The patentability of an invention is not reviewable by this court in an interference proceeding.

3. Where the records show that the primary examiner had found no novelty in the omission of a cutter-bar in the old form of fodder-shredder from the new combination, and had, "with doubt and hesitation," declared novelty to exist in the restricted action of the cutter-teeth in immediate relation with the lower feed-roll acting as a cutter-bar in the very closest approach that could be accomplished, it was *held* that the slight difference in arrangement being the very thing and the

only thing that gave novelty to the new combination, it followed that the practical test of a combination which did not fall within the specific combination was not a reduction to practice of that combination; *following* Breul *v.* Smith, 10 App. D. C. 180.

Patent Appeals. No. 107. Submitted November 18, 1898. Decided January 10, 1899.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Reversed.*

The facts are sufficiently stated in the opinion.

*Messrs. Foster & Freeman* for the appellants.

*Messrs. Coburn, Hibben & McElroy* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an interference case involving priority of invention of an improved fodder-shredder.

The decision of the examiner of interferences was in favor of Joseph C. Leslie, and was affirmed by the Examiner-in-Chief. This appeal is from the decision of the Commissioner affirming theirs in turn.

There is no controversy in respect of the facts upon which the case, as we view it, is made to turn.

John D. Tracy and James F. Platt are pantentees of the invention of the issue under date of April 7, 1896, No. 557,727. Their application was filed September 16, 1895. Their invention was reduced to practice September 3, 1895, and manufacture for commercial purposes rapidly followed. The revolving cutter-head for shredding and the feeding rolls were the same that had been in use in fodder-shredders.

The state of the art prior to the invention claimed in the interference is aptly described by Leslie as follows:

" Up to a comparatively recent date, fodder-shredders have been usually built with feed-rolls provided with smooth surfaces; and with a cutter-bar located between the lower feed-roll and the shredder-head, the said cutter-bar serving to support the material in close proximity to the teeth of the

shredder-blades mounted upon the said shredder-heads. Such feed-rolls have commonly been made of a considerable diameter. More recently, in order to adapt the feed-rolls to snap off the ears of corn, which are left upon the stalk when fed to the machine, the feed-rolls have been provided with fluted or corrugated surfaces, which enable them to take firm hold of the stalks. Such feed-rolls are known as "snapping-rolls." The cutter-bar has hitherto always been retained in conjunction with the said snapping-rolls, just as in the older smooth-roll machine."

In the application of Tracy and Platt, after describing the old fodder-shredders, it was said:

" We have discovered that this arrangement is open to certain objections, and that these objections can be overcome by the construction and arrangement hereinafter described, in which the essential feature consists in arranging the shredder or cutter-head in direct relation with the feed-rollers, doing away with any breaker or shear bar interposed between the feed-rollers and cutter-head."

After describing their invention by reference to the drawings they further say:

"In all constructions heretofore made, so far as we are aware, it has been deemed necessary to provide a breaker or shear bar F, interposed between the cutter-head and feed-rolls, and against which the cutters operate.

" We have found that when the cornstalks or other material is fed through the feed-rolls in a wilted condition they will wrap around the lower roll, and the space between the lower roll and the breaker or shear bar will become packed full of the stalks, which interferes with the operation of the machine, reqiring it to be stopped and the material removed, sometimes requiring the machine to be taken apart. We have found that by arranging the shredder-head in direct connection or juxtaposition with the feed-rolls, this objecjection is avoided, the machine simplified, reduced in cost, and greatly improved. Thus, as shown in Fig. 2, the shred-

der-head A is mounted as before, but arranged so that its teeth impinge, or practically so, upon the periphery of the lower feed-roll D. In this arrangement the lower feed-roll serves the double purpose of a feed-roll and a breaker or shear-bar."

After further statement explanatory of the advantages of their improved construction they add:

"It will· be seen that the lower feed-roll, in addition to its function as a feed-roll, performs the function of the ordinary breaker or shear-bar and is in reality a cylindrical revolving breaker which co-operates with the cutter-head to perform the shredding operation."

Their preferred construction is to arrange the shredderhead in such relation to the feed-rolls that the axis of the cutter shall be practically in the same horizontal plane with the axis of the lower feed-roll.

Four claims were· made upon this application. In a notice of rejection it was said: "The examiner can not see that there is any novelty in the omission ˋof the ledgerblade, (cutter-bar). The relations and functions of the remaining parts are the same."

All the claims were rejected upon references. After some amendment and further consideration in the Office, the examiner addressed a communication to Tracy and Platt as follows:

"It seems to the examiner that the sole patentable novelty in this case lies, literally and solely, in the immediate juxtaposition of the circular saws to the feed-rolls, whereby whatever may get wound around the feed-rolls, and thus tend to obstruct their action, is *cut* away by the teeth of the saws.

"It would seem that both the claims in the case fall short of distinctly expressing this idea and in making clear the novelty, in view of the references. In the references Paterson, Greene, Murphy, or even Zimmerman *et al.*, there is a *stripping* action due to the immediate relation to one

another of the feed-rolls and the operating-cylinder. The improvement is specific to this art, and it is considered that a single clause of claim would amply cover all there is of it. It seems that it should be expressed about as follows:

"*The combination of the feed-table, the feed-rolls, and the revolving shredder-head comprising toothed saws or cutters, the cutters being arranged in immediate relation to the lower feed-roll, and the axis of the shredder-head and lower feed-roll being practically in the same horizontal plane, whereby the points of the teeth of the cutters are brought into their closest approach to said roll in said plane.*

"A claim like this would express the understanding had at the oral interview and would be allowed, provided the same idea is developed in the same language in the description as basis therefor."

Amendment of the statement of the essential feature of the invention, as copied hereinabove from the original application, was made, wherein all that follows the word "cutter-head" in the sentence was stricken out and the following substituted:

"In immediate relation to the lower feed-rollers, whereby the points of the teeth of the cutters are brought into their closest approach to said rollers."

The four claims originally made were also stricken out and the two following substituted:

"1. The combination of the feed-table, the feed-rolls, and the rotating shredder-head comprising toothed saws or cutters, the shredder-head being arranged in immediate relation to the lower feed-roll whereby the points of the teeth of the cutters are brought close to the said feed-roll, substantially as described.

"2. The combination of the feed-table, the feed-rolls, and the rotating shredder-head comprising toothed saws or cutters, the cutters being arranged in immediate relation to the lower feed-roll, and the axis of the shredder-head and lower feed-roll being in the same horizontal plane, whereby the

points of the teeth of the cutters are brought into their closest approach to said roll in said plane, substantially as described."

Both of these claims constitute the issue of interference as originally declared; but the first only is made the issue as set forth in the several decisions made therein.

After this amendment the examiner concluded to allow the application, although, as he says afterwards, in a communication to Leslie making objections to his application in several particulars, "in these claims novelty was stretched to its utmost breadth and they were allowed with some doubt and hesitation."

The patent was issued, as we have seen, on April 7, 1896, and on the 22d day of June thereafter Leslie's application was filed, in which the same claims, substantially, are made.

The facts showing Leslie's invention and reduction to practice are well stated in the opinion of the Commissioner as follows:

"The circumstances which led up to the making of the invention by Leslie arose out of negotiations during the early part of 1895, between the Keystone Manufacturing Company, of Sterling, Ill., and the St. Albans Company, by which it was proposed that the Keystone Company should obtain the right to use the St. Albans shredder-head in their corn-husking machine. This husking-machine consisted of a set of feed-rolls about three inches in diameter, deeply fluted and pressed together by strong springs, so as to give the rolls in feeding a strong grip of the fodder passing through them. When an ear of corn on the fodder was brought to the rolls it could not pass through, but would be pinched or snapped off by the rolls, which, on account of of this action, were termed "snapping-rolls." A rotating knife-head for cutting the fodder fed through the rolls was mounted in bearings in front of the rolls and operated against a cutter-bar placed between the rolls and the knife-head to cut the fodder into short lengths. This knife-head

was twelve-inches in diameter, and was similar to the cutter of a lawn-mower. The cutter-bar against which it operated was from two and a half to three inches thick. The St. Albans shredder-head consists of a series of circular saws about sixteen inches in diameter, having large teeth, the saws being set on an oblique angle to the axis of the shaft on which they are mounted and parallel to each other.

"In order to be sure that the St. Albans shredder-head could be substituted for the Keystone knife-head in the Keystone corn-husker, the St. Albans Company borrowed a No. 2 Keystone husker from a Mr. Sweet at Eagle Bridge, N. Y. This machine was received from Sweet by the St. Albans Company about the middle of April, 1895, when Leslie had it set up in the St. Albans works and began to make arrangements to test it and make the necessary changes to put the St. Albans shredder-head in place of the Keystone knife-head. This knife-head being only twelve inches in diameter and the shredder-head being sixteen inches, it was necessary to reduce the width of the cutter-bar then in the machine. Leslie took this wide cutter-bar of two and a half or three inches out of the Keystone machine and substituted for it a cutter-bar about one-third as wide, and put in the sixteen-inch shredder-head. To try the Keystone machine as thus changed, he ran it through dry cornstalks and found that it worked satisfactorily. This being Leslie's first experiment with fluted or snap rolls, his experience in operating fodder-shredders made him doubtful about the machine working satisfactorily with wet and damp fodder, as he thought the fodder in this condition would draw in behind the cutter-bar. To try the machine on wet fodder, he obtained a load of fodder and thoroughly wetted and soaked it. When he attempted to run this wet fodder through the machine it became wrapped around the bottom snapper-roll and forced the cutter-bar out against the shredder-head and caused the stopping of the machine. He then concluded to remove

the cutter-bar, and, on trying the machine without it, he found that it worked satisfactorily, both on wet and dry fodder, and shredded the fodder even better than with the cutter-bar in place.

"This was done during the latter part of May, 1895. From this time until August 1, 1895, when the Keystone machine was returned to Mr. Sweet with the shredder-head taken out and the machine put in the condition in which it was received from him, the machine was frequently run to show people its operation. Shredded fodder cut on the machine during these operations was taken to the barn, fed to horses, used for bedding, and pressed in a small press which the company had for making samples to send out and for filling sample-bags."

The question raised for determination on the foregoing facts is, whether Leslie's rearrangement and operation of the Keystone cutter was a reduction to practice of the machine of the issue.

The Examiners-in-Chief in their decision say that the opening sentence of the letter of the primary examiner to Tracy and Platt, hereinabove set forth, shows that he did not understand the operation of the machine. It shows, they say, that "he thought that the material got wound around the lower feed-roll, and that while so wound thereon the teeth there stripped (shredded) it and tore it from the roll. In the machine the material does not get around the roll. It was intended to prevent that, and that is its new and useful result."

Whether the primary examiner fully comprehended the exact operation of the Tracy and Platt machine, is a question that we are not called upon to decide. He was charged with the duty of examining and reporting upon its patentability, and upon his final approval the patent was issued in due course of proceeding in the Office. He expressed and adhered to the opinion that there was no novelty in the omission of the cutter-bar of the old combination. But with

"some doubt and hesitation," he concluded that there was novelty, "literally and solely, in the immediate juxtaposition of the circular saws to the feed-rolls, whereby whatever may get wound around the feed-rolls, and thus tend to obstruct their action, is cut away by the teeth of the saws."

It is probable that the concluding observation of the foregoing statement was intended not so much to express the particular contemplated action of the cutter-head saw-teeth in co-operation with the lower feed-roll as to show how it was calculated to avoid a condition the existence of which all the evidence tends to show.

That evidence disclosed that with the old cutter-bar as a shearing-block wet and wilted cornstalk-fodder and smaller feed-stalks would ordinarily be impeded in their forward movement and rolled up between the cutter-bar and the lower feed-roll, thereby clogging the machine as well as causing a failure to shred.   (See foregoing statement of Leslie's experiments.)

This probable view of what was in the mind of the examiner at the time has foundation in the fact that the specifications before him plainly declared that the lower feed-roll, operating, preferably, with its axis in the same horizontal plane as that of the cutter-head, performs the additional "function of the ordinary breaker or shear-bar, and is in reality a cylindrical revolving breaker which co-operates with the cutter-head to perform the shredding operation."

Then, without inconsistency, he recommended that one claim would express the invention, namely: "The combination of the feed-table, the feed-rolls, and the revolving shedder-head comprising toothed saws or cutters, the cutters being arranged in immediate relation to the lower feed-roll, and the axis of the shredder-head and lower feed-roll being practically in the same horizontal plane, whereby the points of the teeth of the cutters are brought into their closest approach to said roll in said plane."

From the history of his action in the case it seems quite

clear to us that the examiner, having found no novelty in the omission of the cutter-bar of the old from the new combination, and having "with doubt and hesitation" declared novelty to exist in the very restricted action of the cutter-head teeth in immediate relation with the lower feed-roll, acting also as a cutter-bar, in the very closest approach that could be accomplished, would have rejected an application disclosing nothing more than the invention of Leslie's reduction to practice, in which the cutter-bar was merely taken out, leaving an inch of open space between the edges of the cutter-teeth and the periphery of the lower feed-roll at the point of nearest approach.

Had both inventions, as so reduced to practice, been before the examiner at the same time, it is probable that his doubts in respect of the novelty of that of Tracy and Platt would not have been removed, and that he would have rejected both for the same reason.

Be that as it may, however, we are compelled to assume for the purposes of this case that the specific combination of the Tracy and Platt patent was rightly allowed. *Cushman* v. *Lines,* 10 App. D. C. 156; *Breul* v. *Smith,* 10 App. D. C. 180, 185; *Hisey* v. *Peters,* 6 App. D. C. 68, 70. Whether right or wrong, that decision, in so far as its effect in this case is concerned, must be accepted as final and conclusive, and we are not to be understood as expressing our own conclusion as to its soundness.

Acting, as we must, upon the narrow view of the element of invention that prevailed in the consideration and allowance of the Tracy and Platt application, we are constrained to differ from the conclusion of each tribunal of the Patent Office in respect of Leslie's claim of reduction to practice of the combination of the issue in accordance with the principle controlling our decision in a former case. *Breul* v. *Smith,* 10 App. D. C. 180, 185.

Grant that there is but a mere difference in degree or in the mode of adjustment between the machine as first

constructed and tested by Leslie and that of Tracy and Platt;
and yet, nevertheless, it was that very difference in adjust-
ment which led to the declaration of novelty in the combi-
nation of Tracy and Platt, and to the issue of their patent,
and which prompted the specific and narrow terms of the
issue of interference.   That slight difference in arrange-
ment being the very thing, and the only thing, that gave
novelty to the machine of Tracy and ·Platt and entitled it
to a patent, and the soundness of that conclusion being be-
yond our inquiry and review in this proceeding, it must
necessarily follow that the practical test of a combination
which did not embrace it is not its reduction to practice.
*Breul* v. *Smith,* 10 App. D. C. 180, 185, 186.

The applicability of the doctrine of that case to this is
emphasized by this fact: Leslie's application was filed more
than two months after the issue of the Tracy and Platt pat-
ent, and his claims were made for the purpose of an inter-
ference.   *Latham* v. *Force and Parenteau,* 82 O. G. 1690.

That decision, made February 24, 1898, is apparently in
force as establishing a rule of action in the Office, and is
directly in point.   The claim was there made that reduction
to practice of a broad molding process of covering eyelets
embraced a specific process patented to Force and Parenteau,
the claims of which formed the issue of interference, and
was sustained by the examiner of interferences and the
Examiners-in-Chief.   In reversing those decisions it was
said :

"The issues are the claims of Force and Parenteau's
patent.   Their meaning must be determined by considera-
tion of the description on which they are based.   Latham,
having made these claims after he had seen Force and Par-
enteau's patent, and having drawn them for the purpose of
an interference with the patent, must be held to have in-
tended them to have the same meaning which they have in
the patent.   In other words, Latham must meet Force and
Parenteau on their own ground.   He is not entitled to put

upon the claims of the patent a construction which would render them invalid by reason of what he had done in 1891, if by any reasonable construction they could be held valid as restricted to a specific process not invented by him prior to the filing of the application on which their patent was granted."

For the reason given the decision of the Commissioner will be reversed and the proceedings and decision herein certified to him in compliance with the law. It is so ordered.                                                          *Reversed.*